1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    DIANA RAUSE, surviving natural       )    No. CV-07-8076-PCT-SMM
     mother of JOHNNY MENDOZA,            )
10   JR., deceased, individually and on   )    **MEMORANDUM OF DECISION AND**
     behalf of all wrongful death         )    **ORDER**
11   beneficiaries; GABRIEL              )
     RODRIGUEZ, a single man,             )
12                                        )
                                          )
13                                        )
                  Plaintiffs,             )
14                                        )
     v.                                   )
15                                        )
                                          )
16   PAPERCHINE, INC., a foreign          )
     corporation; ABITIBI                 )
17   CONSOLIDATED SALES                   )
     CORPORATION, a foreign               )
18   corporation; DOES I-X; BLACK         )
     CORPORATIONS I-X; and WHITE          )
19   PARTNERSHIPS I-X,                    )
                                          )
20                                        )
                                          )
21                Defendants.             )
                                          )
22   _____ )

23         Before the Court is Plaintiff Diana Rause's Motion for Partial Summary Judgment

24   arguing that Defendants Paperchine, Inc. and Abitibi Consolidated Sales Corp. owed non-

25   delegable duties to Plaintiff, and that Defendants retained sufficient control of safety on the

26   worksite to lead to liability for decedent Johnny Mendoza, Jr.'s death (Doc. 135).  Additionally,

27   Paperchine and Abitibi each bring  Cross-Motions for Partial Summary Judgment on the issues

28   of premises liability and retained control (Doc. 148, 157).  All the motions have been fully

briefed, and oral argument was held on August 4, 2010 (Doc. 220).[1]  Previously, the Court granted two motions to supplement the record (Docs. 199, 230), and the additional deposition testimony of David Young, Remi Turcotte, Richard Scullion, Christopher Davies, Dan Morris, David Lovaas, John McKee, and Johnny Mendoza, Sr. has been considered by the Court in reaching its ruling.[2]  Having reviewed the parties' contentions, the Court now issues this Memorandum of Decision and Order.

## BACKGROUND[3]

Plaintiff Diana Rause ("Plaintiff") is the surviving mother of decedent Johnny Mendoza, Jr. and brings this action on behalf of herself and all wrongful death beneficiaries under A.R.S.§ 12-611 et seq.  Johnny Mendoza, Jr. was killed on August 16, 2006, as a result of falling more than thirty-seven feet to the floor of a paper mill (Doc. 136, Pl.'s Separate Statement of Facts ("PSSOF") ¶ 1).

Abitibi Consolidated Sales Corporation ("Abitibi") is the owner of the Snowflake paper mill where the accident occurred that led to the decedent's death.   Paperchine, Inc. ("Paperchine") is an engineering and service firm that specializes in the paper mill industry (Doc. 153, Def. Paperchine's Separate Statement of Facts ("DPSSOF") ¶ G).   Enerquin specializes in the design, fabrication, and installation of sheet metal hoods and exhaust systems for the paper industry (Id. ¶ H).

Mill owner Abitibi contracted with Paperchine, a general contractor, to perform the work necessary to upgrade the #3 machine at Abitibi's mill in Snowflake, Arizona (PSSOF ¶ 3).  The Abitibi Purchase Order that finalized the parties' agreement incorporated by reference Abitibi's

---

[1]The oral argument focused primarily on the retained control issues.

[2]Each of these witnesses was deposed after Plaintiff filed her Motion for Partial Summary Judgment.  In the interest of judicial efficiency and economy, the Court granted Defendants' motions to supplement the record to have all the applicable facts before it at one time.

[3]The following facts are undisputed unless otherwise noted.

General Terms and Conditions, but not Paperchine's form terms and conditions (Doc. 222, Ex. A, Purchase Order).  Abitbi also provided contractors such as Paperchine with its Contractor's Rules and Health and Safety Policy Manual (Doc. 136, Exs. G & H).

Paperchine, in turn, contracted with subcontractor Enerquin to remove the hoods during the upgrade of machine #3 at the Abitibi paper mill (PSSOF ¶ 2).  Decedent Johnny Mendoza, Jr. and co-worker Gabriel Rodriguez were employees of Enerquin (Id.).[4]  Prior to Enerquin's work on the project, Paperchine provided Enerquin with hard copies of Abitibi's Contractor Rules and Health and Safety Policy Manual (DPSSOF ¶ O).  Abitibi required each of Enerquin's employees to read the safety manual, and sign an acknowledgment that they understood the terms (Id.)  Additionally, Paperchine qualified Enerquin to assure it had adequate safety procedures (Id. ¶¶ K-N).

At the Abitibi paper mill, Enerquin performed the duct work and hood removal in the dryer section, including supplying both its own equipment and employees for the work (Id. ¶ AA).  Between August 14, 2006, and August 15, 2006, Enerquin removed approximately twenty-one false ceiling panels above machine #3 in order to install the cross machine duct work (PSSOF ¶ 6; DPSSOF ¶ EE).

At some point, Paperchine needed to remove at least one dryer can.  After determining that it would be easier and more expeditious to use a Gantry crane to remove the dryer can(s), and since Enerquin had already removed twenty-one false ceiling panels, Paperchine requested that Enerquin remove two additional false ceiling panels to provide sufficient room for the crane (PSSOF ¶ 7; DPSSOF ¶ HH).  Specifically, Paperchine asked Enerquin if Enerquin could remove two additional panels "when [Enerquin] had some people free." (DPSSOF ¶ II)

On August 16, 2006, David Young, Enerquin's U.S. Operations Director, assigned the work to Enerquin's Field Supervisor, Johnny Mendoza, Sr. — the individual responsible for assigning work to the crew, supervising the crew, and training the crew with respect to safety

---

[4] Gabriel Rodriguez also was a Plaintiff to the instant litigation.  However, his claims were dismissed for failure to prosecute under Federal Rule of Civil Procedure 41(b) (Doc. 104).

1    and fall protection (Id. ¶¶ JJ-KK).  Johnny Mendoza, Sr. then assigned the job to remove the

2    additional panels to his son, Johnny Mendoza, Jr., and Gabriel Rodriguez (Id. ¶ LL).

3        On August 16, 2006, Johnny Mendoza, Jr., and Gabriel Rodriguez were provided with

4    fall protection equipment, including full body harnesses, two-legged lanyards which allowed

5    for a 100% tie-off, and retractable lanyards (Id. ¶ NN).  Johnny Mendoza, Sr., then instructed

6    his son and Gabriel Rodriguez on the work to be completed, identified the tie-off points,

7    reinforced the danger of working at elevation, and reminded them to make sure to tie-off (Id.

8    ¶ OO).  In the area of fall protection, Enerquin required its employees to maintain a 100% tie

9    off at all times (Id. ¶ X).

10       For unknown reasons, Johnny Mendoza, Jr. (and Gabriel Rodriguez) disregarded

11   Enerquin's safety requirements and the advice of their supervisor, Johnny Mendoza, Sr., by

12   failing to maintain a 100% tie-off and, as a result, Johnny Mendoza, Jr., suffered a fatal head

13   injury when he fell over thirty-seven feet (Id. ¶ QQ).

14   **STANDARD OF REVIEW**

15       Upon motion at any time, a party defending against a claim may move for "partial

16   summary judgment," that is, "summary judgment on . . . part of the claim."  Fed. R. Civ. P.

17   56(b).  A court must grant summary judgment if the pleadings and supporting documents,

18   viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue

19   as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R.

20   Civ. P. 56(c)(2); see Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed.

21   Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are

22   material.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986);  Jesinger, 24 F.3d at 1130.

23   "Only disputes over facts that might affect the outcome of the suit under the governing law will

24   properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  The dispute

25   must also be genuine, that is, the evidence must be "such that a reasonable jury could return a

26   verdict for the nonmoving party."  Id.

27   ///

28   - 4 -

1   A principal purpose of summary judgment is "to isolate and dispose of factually

2   unsupported claims." Celotex, 477 U.S. at 323-24.  Summary judgment is appropriate against

3   a party who "fails to make a showing sufficient to establish the existence of an element essential

4   to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322;

5   see Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994).  The moving party need

6   not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477

7   U.S. at 323-24.  The party opposing summary judgment need not produce evidence "in a form

8   that would be admissible at trial in order to avoid summary judgment." Id. at 324.  However,

9   the nonmovant "may not rest upon the mere allegations or denials of [the party's] pleadings, but

10  . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

11  56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986);

12  Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

13                                      **DISCUSSION**

14  As Plaintiff brings this claim under federal diversity jurisdiction, (Doc. 1, Compl.), the

15  parties agree that the Court must apply Arizona substantive law.  Martinez v. Asarco Inc. 918

16  F.2d 1467, 1470 (9th Cir. 1990) (citing American Triticale, Inc. v. Nytco Servs., Inc., 664 F.2d

17  1136, 1141 (9th Cir.1982) ("[i]t is well settled that a federal court exercising diversity

18  jurisdiction must apply substantive state law").  Procedural issues, however, are governed by

19  federal law.  Hanna v. Plumer, 380 U.S. 460, 470-74 (1965).  In the instant action, this includes

20  the standard for reviewing entry of summary judgment.  See Fed. R. Civ. P. 56(c); Darring v.

21  Kincheloe, 783 F.2d 874, 876 (9th Cir.1986).

22  In making determinations of Arizona law, the Court will follow the decisions of the

23  Arizona Supreme Court.  Decisions of Arizona's appellate courts serve as "dat[a] for

24  ascertaining state law which [are] not to be disregarded by a federal court unless it is convinced

25  by other persuasive data that the highest court of the state would decide otherwise." Comm'r

26  v. Bosch, 387 U.S. 456, 465 (1967).

27  ///

28                                       - 5 -

In her motion for partial summary judgment, Plaintiff argues that Abitibi, as a property owner, owed non-delegable duties to Enerquin's employees to provide and maintain the premises/construction area in a safe condition and to assure that the work was performed safely. Likewise, Plaintiff contends that Paperchine, as a general contractor in possession of the property, owed non-delegable duties to Enerquin's employees to maintain a safe working environment.  Since these duties were non-delegable, Plaintiff seeks a determination from the Court that Abitibi and Paperchine are vicariously liable for the breach of these duties by any entity to whom the duties were delegated, whether Paperchine or Enerquin.

Plaintiff asserts two theories against Abitibi: (1) premises liability and (2) retained control.  Additionally, Plaintiff asserts that Paperchine is vicariously liable for Enerquin's negligence under three theories: (1) premises liability; (2) retained control; and (3) statutory and contractual responsibility.

## I.    Independent Contractor Rule

Generally, an employer is not vicariously liable for the negligence of an independent contractor resulting in injury, unless the employer of the contractor has been independently negligent. Ft. Lowell-NSS Ltd. P'ship v. Kelly, 166 Ariz. 96, 101, 800 P.2d 962, 967 (1990); E.L. Jones Constr. Co. v. Noland, 105 Ariz. 446, 454, 466 P.2d 740, 748 (1970); Restatement (Second) of Torts §§ 410-415.  This general principle of nonliability, known as the independent contractor rule, was premised on ideas of fairness and risk allocation.  Ft. Lowell, 166 Ariz. at100, 800 P.2d at 966.  In a line of cases, the courts implicitly concluded that it was unjust to hold an employer liable for the negligence of an independent contractor over whom the employer exerted no control.  Id.  This lack of control over the manner in which the independent contractor performed the work made the undertaking the contractor's enterprise, not the employer's.  Id.  As a result, from a policy standpoint, the independent contractor was the proper party to be tasked with preventing the risk, as well as administering and distributing it. Id.  However, the development in the marketplace of some employers disguising master/servant relationships as employer/contractor relationships, simply to delegate liability, led some courts

- 6 -

to criticize the doctrine.  See Crowell v. Benson, 285 U.S. 22, 82 (1932) (Brandeis, J., dissenting) ("[w]hether an individual is an employer or an independent contractor depends upon criteria often subtle and uncertain of application . . .").

Through the years, courts began to recognize exceptions to the general rule of nonliability where the application of the rule appeared to violate public policy.  These exceptions fall into three categories: the inherently dangerous work exception, the non-delegable duty exception, and exception for torts caused by the direct negligence of the employer in selecting, instructing, or supervising the contractor.  See Restatement (Second) of Torts § 409, comment b (1965); see, e.g., Parks v. Atkinson, 19 Ariz. App. 111, 114, 505 P.2d 279, 282 (Ct. App. 1973) (recognizing the inherently dangerous work exception); Ft. Lowell, 166 Ariz. at 101, 800 P.2d at 967(discussing non-delegable duties); Lewis v. N.J. Riebe Enters., Inc., 170 Ariz. 384, 394, 825 P.2d 5, 15 (1992)(finding the employer directly liable because he retained control of the work).  Due to these exceptions, an employer may be vicariously liable for the contractor's negligence, even where the employer is not personally negligent. Eventually, these exceptions became codified in Restatement §§ 410-429 (generally, §§ 410-415 deal with direct liability, while §§ 416-429 deal with vicarious liability).

Arizona courts will usually apply the law of the Restatement, provided that its provisions do not conflict with existing Arizona law.  Ft. Lowell, 166 Ariz. at 102, 800 P.2d at 968.

**II.     Premises Liability (Restatement § 422)**

Plaintiff claims that as the owner and possessor of the paper mill where the decedent Johnny Mendoza, Jr. worked, Abitibi had a duty to maintain the premises in a safe condition for invitees and to ensure that all construction work was completed in accordance with applicable safety regulations.  Likewise, Paperchine had the same obligations as a joint possessor of the property.  Plaintiff maintains that these duties were non-delegable, and thus, Defendants are liable for the negligence of their independent contractors to whom they may have delegated some of the duties, in addition to Defendants' own negligence.  Drawing upon the Arizona Supreme Court's decision in Ft. Lowell, Plaintiff argues that Restatement 422

1    makes "a possessor of land liable to invitees for the negligence of an independent contractor

2    hired to do construction or repair work on the premises."  166 Ariz. at 101-02, 800 P.2d at 967-

3    68.  According to Plaintiff, Arizona law considers employees of independent contractors as

4    invitees.[5] While Defendants Abitibi and Paperchine rely upon Welker v. Kennecott Copper Co.,

5    1 Ariz. App. 395, 403 P.2d 330 (Ct. App. 1965) for their claim that a subcontractor's employees

6    are not owed the same non-delegable duty as other invitees, Plaintiff argues that Welker is no

7    longer good law.

8         In its Response to Plaintiff's summary judgment motion and own Cross-Motion,

9    Paperchine first argues that whether Paperchine is a possessor of land as defined in Restatement

10   § 328E is a question of fact for a jury.  As Restatement 422 only applies to a "possessor of

11   land," the Court will address this preliminary issue first.

12        A.    Definition of a "Possessor"

13        Paperchine claims that the determination of whether it qualifies as a possessor of land

14   under Restatement § 328E is not properly the subject of a dispositive motion, but rather is a

15   factual question.  Paperchine asserts that genuine issues of material fact exist  as to how much

16   control Abitibi retained over the Snowflake Mill while the remodel was ongoing and how much

17   control Paperchine had over the entire site.  Due to these factual questions, Paperchine claims

18   that Plaintiff's premises liability argument should be denied.  Plaintiff responds that as a general

19   contractor responsible for the construction work done at the site, Paperchine occupied the work

20   site and controlled it through its supervisors.

21        Restatement § 422 is framed in a terms of a "possessor of land" who entrusts to an

22   independent contractor construction, repair or other work on the land, or on a building or other

23   structure upon it.  The definition of "possessor" can be found in Restatement § 328E and

24   includes:

25   _____

26        [5]A business invitee is defined in the Restatement as "a person who is invited to enter or
     remain on land for a purpose directly or indirectly connected with business dealings with the
27   possessor of the land."  Restatement (Second) of Torts § 332(3).

28                                        - 8 -

(a) a person who is in occupation of the land with intent to control it or
(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

"Unlike the issue of duty, which is a question of law, whether a party exercises control over the land is 'a question of fact which ordinarily should be left to the fact finder.'" Tostado v. City of Lake Havasu, 220 Ariz. 195, 201-02, 204 P.3d 1044, 1050-51 (Ct. App. 2008) (citing Sanchez v. City of Tucson, 191 Ariz. 128, 130, 133, 953 P.2d 168, 170, 173 (1998)). The Court finds that whether Paperchine exercised control over the work site, and the amount of that control, are question of fact that should be left for a jury. Moreover, Plaintiff's reliance on Durbin v. Karber Air Conditioning Co. is inapposite. In that case, the Arizona Court of Appeals did not find that a general contractor was a possessor of land, but rather that "[t]he general contractor in control of the premises has certain duties to the employees of a subcontractor that are usually likened to those of a possessor of land to invitees." 161 Ariz. 416, 419, 778 P.2d 1312, 1315 (Ct. App. 1989). As to Abitibi, it does not contest that it is a possessor of land.

**B.    Validity of Welker v. Kennecott Copper Co.**

Even if Paperchine is considered a possessor, as Plaintiff claims, Paperchine argues that it owes no duty to  Enerquin employees such as Johnny Mendoza, Jr. because Restatement § 422 does not apply to suits by employees of independent contractors. Paperchine argues that Welker remains a valid precedent in Arizona and that Plaintiff's reliance on the Ft. Lowell decision is misguided. Also drawing on Welker, Abitibi argues that a landowner does not owe a non-delegable duty to its contractor's employees. Plaintiff, however, maintains that Welker is no longer good law, and the Court should look instead to the Arizona Supreme Court's Ft. Lowell decision. Since the parties' arguments largely are grounded in Welker's continued validity, the Court will examine that decision, as well as subsequent case law interpreting it.

In Welker, 1 Ariz. App. 395, 403 P.2d 330, the estate of Melvin Welker filed a lawsuit against Kennecott Copper Company alleging that the company negligently caused the death of Welker. Welker was the employee of Sterns-Rogers, a general contractor. Id. at 397, 403 P.2d

at 332.  After successfully bidding to expand Kennecott's crushing and milling facilities, Stern-Rogers set their employees working on the foundation for the expanded structures.  Id.   To reinforce the heavy machinery, it was necessary to excavate holes for foundation footings.  Id. Welker was cleaning out one of the footings when a bank of earth collapsed above him, leaving him to suffocate ten feet underground.  Id.  Welker claimed that Kennecott, as the owner and possessor of the land, had a duty of care for the employees of the contractor.  Id. at 398, 403 P.2d at 333.  Both parties acknowledged that generally a contractee with an independent contractor is not liable for the independent contractor's negligence; however, Welker claimed that the facts of the case placed him within an exception to the general rule.  Id. at 401, 403 P.2d at 336.  Welker claimed that he was entitled to relief based on Restatement §§ 413, 414, 416, 422, and 427.  The Restatement section at issue here, § 422, provides:

> A possessor of land who entrusts to an independent contractor construction, repair, or other work on the land, or on a building or other structure upon it, is subject to the same liability as though he had retained the work in his own hands to others on or outside of the land for physical harm caused to them by the unsafe condition of the structure (a) while the possessor has retained possession of the land during the progress of the work, or (b) after he has resumed possession of the land upon its completion.

Delving into the question of non-delegable duties of a contractee with an independent contractor, the court noted that it had become "embroiled in a mass of case law which seems to know no end."  Welker, 1 Ariz. App. at 401, 403 P.2d at 336.  The court criticized the distinctions made in the Restatement, including vague concepts such as "special precautions", "peculiar risk of bodily harm", "inherently dangerous to others", and "dangerous character of work."  The court in Welker emphasized that allowing for these exceptions left a lot of room for discretion, and could be confusing for businesses trying to prepare for liability.  Id. ("[t]erms such as 'special precautions' and 'peculiar risk of bodily harm', 'inherently dangerous to others' and 'dangerous character of the work' are fine prose but difficult to apply to actual situations so as to mark out the line between liability and nonliability" (citations omitted)).  The court therefore found that not applying liability to the employees of independent contractors would lead to more predictability for businesses.  Id.

- 10 -

The court of appeals in <u>Welker</u> found that the primary issue was whether a contractee with an independent contractor owes the duties under the Restatement to an employee of an independent contractor.  <u>Id.</u>  This question, the court found, centered on the definition of the word "others" as used in the Restatement.  <u>Id.</u>  If the phrase "injury to other" refers to both employees of the independent contractor and third parties, then Kennecott was vicariously liable for the death of Welker.  If however, as the court found, that "injury to others" refers only to third parties, then a contractee cannot be held vicariously liable for injury to an independent contractor's employees.

To support the proposition that the terms "others" does not refer to employees of independent contractors, the court quoted the introductory note to Chapter 15 of the Restatement:

> On the other hand, in these exceptional situations, dealt with in §§ 416 to 425 inclusive, in which the employer owes a non-delegable duty to others to make the completed work reasonably safe, he is subject to liability for injury caused by any negligence of the contractor which results in the work not being up to the required standard of safety.

<u>Id.</u> at 401-02, 403 P.2d at 336-37.  Since the Restatement focused on "completed work," the liability to others clearly referred to "adjoining property owners, tenants, business invitees," rather than to workers during "[t]ransitory conditions."  <u>Id.</u> at 402, 403 P.2d at 337.  The court distinguished the duties in Restatement §§ 413, 416, 423, and 427 from the duty in § 414 because the latter duty of using due diligence to exercise control actually retained was one that could be delegated by the contractee.  <u>Id.</u>

The court also concluded that the non-delegable duties were not intended to include the employees of independent contractors because none of the comments and illustrations in the Restatement refer to a duty to workers on a jobsite.  <u>Id.</u>  The court focused on comment c. to Restatement § 416 as showing that employees of independent contractors are not owed a duty:

> The liability imposed by the rule stated in this Section upon one who employs a contractor to take precautions for the safety of others, which the employer knows that the nature of the work will necessarily require, is no greater than that to which the employer would be subject if he retained the taking of these precautions in his own hands.

- 11 -

1   Id.  The court argued that, since the injuries of an employer's own workers would be covered

2   by workers' compensation, the authors of the Restatement could not have been referring to

3   employees of independent contractors.  Id.  To further support this idea, the court quoted an

4   unpublished draft from the American Law Institute which stated that the "others" referred to in

5   the Restatement are not to include "the employees of the contractor, as well as those of the

6   defendant himself."  Id. at 402-03, 403 P.2d at 337-38.  While the court acknowledged that the

7   note was not authoritative, it stated that the note provided support that the Restatement has not

8   addressed the meaning of "others."  Id. at 403, 403 P.2d at 338.

9         Concluding, the Arizona Court of Appeals held that the duties outlined in §§ 413, 416,

10   422, and 427 of the Restatement were not owed to employees of independent contractors.  Id.

11   at 404, 403 P.2d at 339.  The court based its holding on two grounds.  First, a contractee should

12   not be held liable for injuries to employees of independent contractors since those employees

13   are already covered under workers' compensation.  Id.  Since the contractee directly or

14   indirectly pays workers' compensation premiums, the court found that it is not escaping liability

15   through hiring an independent contractor.  Id.  Second, the exceptions to the general rule are

16   confusing and make it difficult for contractors and their employers to prepare for liability.  Id.

17   Furthermore, the court limited its rule of nonliability to "situation[s] where the contractee has

18   turned over safe premises to the independent contractor without hidden and/or concealed defects

19   and has not retained control of the premises where the work is being performed[.]"  Id. at 404-

20   05, 403 P.2d at 339-40.

21         C.    Subsequent Case Law After Welker

22         Far from overturning Welker, subsequent Arizona court decisions have upheld Welker's

23   ruling that the duties in Restatement § 422 are not owed to employees of independent

24   contractors.

25               1.    Parks v. Atkinson (1973)

26         In this post-Welker case, the Roman Catholic Church was performing a reconstruction

27   project and retained M.J. Lang as its general contractor.  Parks v. Atkinson, 19 Ariz. App. 111,

28                                              - 12 -

1    113, 505 P.2d 279, 281 (Ct. App. 1973).  The plaintiff was employed as a employee of M.J.

2    Lang.  Id.  The plaintiff was injured when he fell from a scaffold at the site, and sued M.J. Lang

3    as well as the Roman Catholic Church as the landowner.  Id.  In granting summary judgment

4    for defendants, the court held a landowner is not liable for the negligence of an independent

5    contractor.  Id. at 114, 505 P.2d at 282.  Although the plaintiff claimed that liability should be

6    imposed pursuant to Restatement § 422, the court pointed to Welker as holding that the duties

7    in § 422 were not owed to employees of independent contractors.  Id.  The court then stated that

8    it "[saw ]no reason not to adhere to our decision in Welker."  Id.

9                    2.    Allison Steel v. Superior Court (1974)

10           A year later, the Arizona Court of Appeals reinforced the rule that a landowner or

11   contractor owes no non-delegable duty to the injured employee of a contractor or subcontractor

12   to provide a safe work place.  Allison Steel Mfg. Co. v. Superior Court for the County of Pima,

13   22 Ariz. App. 76, 81, 523 P.2d 803, 808 (Ct. App. 1974).  Therefore, if a landowner or

14   contractor had no active role in bringing about the dangerous condition which caused the injury,

15   they cannot be held liable under a theory of non-delegable duty.  Id.

16                   3.    Koepke v. Carter Hawley Hale Stores, Inc. (1984)

17           The plaintiff in this case was injured while shopping at a department store.  Koepke v.

18   Carter Hawley Hale Stores, Inc., 140 Ariz. 420, 422, 682 P.2d 425, 427 (Ct. App. 1984).

19   Although the store was undergoing remodeling and repair, it remained open for business.  Id.

20   As the plaintiff was walking down an aisle toward the elevator, employees of an independent

21   contractor hired by the store stretched a chalk line across the aisle in her path.  Id.  The plaintiff

22   tripped on the line and fell and injured her knee.  Id.  The plaintiff sued both the owner of the

23   department store and the independent contractor for negligence.  Id.  Among the plaintiff's

24   bases for recovery against the landowner was vicarious liability for the independent contractor's

25   negligence under Restatement § 422.  Id.

26           In deciding whether to adopt Restatement § 422(a) in Arizona, the court in Koepke

27   pointed out that previous caselaw, including Welker, had referred to § 422 only to note that it

28                                              - 13 -

1  did not apply in actions brought by employees of independent contractors.  Id. at 423 n.3, 682

2  P.2d at 428 n.3.  The court continued, "The policy underlying this refusal to apply Restatement

3  § 422 to employees of independent contractors is unrelated to the question of liability for

4  injuries to business invitees."  Id.  The plaintiff was not one of the independent contractor's

5  workers, but rather a customer of the department store.  The Koepke court went on to adopt

6  Restatement § 422(a) in Arizona and hold that a landowner could be vicariously liable for

7  injuries to an invitee caused by an independent contractor's negligence.  Id. at 425, 682 P.2d at

8  430.

9       In making the distinction between employees of independent contractors and business

10  invitees, the Koepke court reaffirmed the Welker rule that Restatement § 422 does not apply to

11  suits by independent contractors' employees.

12            4.    Ft. Lowell-NSS P'ship v. Kelly (1990)

13      In Ft. Lowell, the plaintiff's employer, National Self-Storage Development, Inc., operated

14  a storage facility on land owned by Ft. Lowell-NSS Limited Partnership.  166 Ariz.at 98, 800

15  P.2d at 964.  The landowner retained a general contractor who in turn employed an independent

16  contractor to install electrical wiring and fixtures.  Id.  The plaintiff was injured when she

17  received a severe shock while demonstrating an electronic security system installed by the

18  independent contractor.  Id.  The plaintiff claimed that the landowner Ft. Lowell was vicariously

19  liable under Restatement § 422.  Id.  The Arizona Supreme Court found for the plaintiff, and

20  held that a landowner can be vicariously liable for the negligence of his contractor under

21  Restatement  § 422.  Id. at 104, 800 P.2d at 970 (specifically adopting § 424(b)).  The court

22  stated that "a possessor of land [is] liable to his invitees for injuries that occur while he is in

23  possession and results from his independent contractor's negligence in performing the duties

24  of the possessor or of the contractor."  Id.

25       However, Ft. Lowell is distinguishable from the case at bar because the plaintiff was an

26  innocent third party, rather than someone connected to the work being performed.  Also, the

27  policy interest in Ft. Lowell differs from the present case.  Arizona courts have held that the

28                                    - 14 -

1    policy underlying the non-delegable duty exception is different depending on whether the

2    injured party is an unrelated business invitee or the employee of an independent contractor.

3    Koepke, 140 Ariz. at 423, 682 P.2d at 428.

4           Ft. Lowell relies upon the same policy distinction laid out in Koepke.  In a footnote, the

5    court explained that the policy underlying a refusal to extend non-delegable duties from a

6    landowner to independent contractors' employees is unrelated to the question of liability for

7    injuries to other types of invitees.  The court stated:

8           Prior to Koepke, Arizona courts considered section 422 only in the context of
            finding it was not applicable to suits by employees of independent contractors.
9           As the Koepke court noted, the policy underlying this refusal to apply
            Restatement § 422 to such employees is unrelated to the question of liability for
10          injuries to other invitees.

11   Ft. Lowell, 166 Ariz. at 102 n.6, 800 P.2d at 968 n.6 (citing Koepke, 140 Ariz. at 423 n.3,  682

12   P.2d at 428 n.3).  The court specifically distinguished cases where the injured party is a business

13   invitee from those where the injured party is the employee of an independent contractor.  Id.

14   Therefore, Ft. Lowell leaves prior caselaw such as Welker and Allison Steel intact that relieves

15   a landowner from any non-delegable duties in regards to employees of contractors.

16                  5.     Lewis v. N.J. Riebe Enterprises, Inc. (1992)

17          The most direct criticism of Welker came in the Arizona Supreme Court's opinion in

18   Lewis.  170 Ariz. 384, 825 P.2d 5.  In that case, the Court rejected the presumption in Welker

19   that without retained control, a general contractor owes no duty of care to employees of

20   subcontractors.  Id. at 388-89, 825 P.2d 9-10.  The Court instead found that a "general

21   contractor has a general duty to provide employees of subcontractors with a reasonably safe

22   place to work." Id. at 389, 825 P.2d at 10.  Importantly, however, the Arizona Supreme Court's

23   rejection of Welker was premised upon an application of Restatement § 414 relating to issues

24   of retained control, and not with respect to the application of Restatement § 422, the section

25   upon which Plaintiff based her premises liability theory. Id. at 388-39, 825 P.2d at 9-10.  Thus,

26   Welker remains good law for the proposition that Restatement § 422 does not apply to suits by

27   employees of independent contractors.

28                                              - 15 -

D.     Conclusion

This Court is bound by Arizona substantive law.  Martinez, 918 F.2d at 1470.  In the absence of an Arizona Supreme Court ruling, the court of appeals' Welker decision has been a precedent in Arizona for almost a half century, and this Court does not find "persuasive data" that the Arizona Supreme Court would decide the issue differently.  See Bosch, 387 U.S. at 465. Welker has not been overruled, and the criticism of Welker, as articulated in Lewis, does not affect Welker's holding as it relates to Restatement § 422.

Therefore, the Court finds that Welker remains good law, and that neither Abitibi or Paperchine owed non-delegable duties to the decedent.  Plaintiff's other arguments are more in the nature of disagreements with the bases underlying the court's decision in Welker.  As a result, the Court grants summary judgment in favor of Abitibi and Paperchine on the issue of premises liability under Restatement § 422.

## III.     Retained Control (Restatement § 414)

A.     Restatement § 414 as a Theory of Direct or Vicarious Liability

In her Motion for Partial Summary Judgment, Plaintiff argues that Defendants Abitibi and Paperchine are vicariously liable for subcontactor Enerquin's negligence, and that of its employee Johnny Mendoza, Jr. due to their alleged retention of control over the method and manner of Enerquin's work.  To support this retained control theory, Plaintiff relies on the Arizona Supreme Court's decision in Lewis and section § 414 of the Restatement.

Restatement § 414 was previously adopted in Arizona and its protection has been extended to the employees of subcontractors.  Welker, 1 Ariz. App. at 405, 403 P.2d at 340 (holding that protection provided by Restatement § 414 applies to independent contractors' employees).  Restatement § 414 provides:

Negligence in Exercising Control Retained by Employer

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Therefore, the employer of an independent contractor is liable only for the employer's own negligence in areas in which he has retained control. Under Restatement § 414, an employer cannot be held vicariously liable for the negligence of an independent contractor; rather Restatement § 414 is a theory of direct liability.

While Plaintiff claims that the practical effect of Restatement § 414 is "basically vicarious liability," the Court finds otherwise (Doc. 169, 13:18-22). The difference between vicarious and direct liability is legally substantive. See Lewis, 170 Ariz. at 390, 825 P.2d at 11 (holding that the court of appeals' reliance on E.L. Jones, 105 Ariz. 446, 466 P.2d 740, a case involving a general contractor's vicarious liability for a subcontractor's negligence, was misplaced because the claim in Lewis was based on a Restatement § 414 theory of direct liability for a contractor's own negligence). While Plaintiff has argued that the end result for applying Restatement § 414 liability is the same as vicarious liability, the requirement for retained control makes the difference significant. Vicarious liability implies that an employer can be held liable for acts that are, by definition, outside the employer's immediate control. Plaintiff's claim that Restatement § 414 "renders the employer/contractee liable for the negligence of its contractor" is therefore incorrect (Doc. 169, 13:22-23).[6] In a case of respondeat superior, an employer can be held vicariously liable for the negligence of an

_____

[6]Plaintiff bases these assertions on language found in Oxford v. United States, an Arizona district court opinion. In Oxford, the court states that, when an employer retains sufficient control over the safety of a work site, the duty to ensure safety is "nondelegable." 779 F. Supp. 1230, 1235-36 (D. Ariz. 1991) (citing Silvas v. Speros Constr. Co., 122 Ariz. 333, 594 P.2d 1029 (Ct. App. 1979); Pruett v. Precision Plumbing, Inc., 27 Ariz. App. 288, 554 P.2d 655 (Ct. App. 1976); Mason v. Ariz. Pub. Serv. Co., 127 Ariz. 546, 622 P.2d 493 (Ct. App. 1980); Rashley v. Wilcox, 160 Ariz. 321, 772 P.2d 1174 (Ct. App. 1989)). However, Plaintiff misreads the concept of nondelegable duty to mean that Restatement § 414 can lead to vicarious liability. The cases the Oxford court refer to all include employers being held directly liable for their own negligence in an area of retained control. Id. Therefore, the court's use of the term "nondelegable" as used in Oxford refers to the fact that an employer cannot delegate a duty while retaining control of that same duty. At oral argument, Plaintiff acknowledged that her initial reading of Oxford, and the proposition for which it was cited in her brief, was erroneous.

1   independent contractor.  See Restatement § 422.  However, in a case involving direct liability,

2   such as Restatement § 414, an employer can only be held liable for the employer's own

3   negligence in an area of retained control.  See Lewis, 170 Ariz. at 390, 825 P.2d at 11.

4          Although Plaintiff couches its Restatement § 414 argument as a theory of vicarious

5   liability, the parties have extensively briefed the issue to rule on whether Abitibi and Paperchine

6   retained sufficient control relating to safety on the jobsite.  Therefore, Defendants' contention

7   that Plaintiff's motion should be denied merely due to improperly framing it as vicarious

8   liability will be denied.

9          B.     Duty Issue

10         Plaintiff claims that Abitibi and Paperchine have retained sufficient control to lead to

11   liability under Restatement § 414.  Before reaching the issue of retained control, however, the

12   Court must examine the threshold question of whether a duty exists in these circumstances.

13                1.     Duty Owed by a General Contractor

14         Restatement § 414 subjects a general contractor to liability only if the general contractor

15   first "owes a duty [to the person injured] to exercise reasonable care."  See Lewis 170 Ariz. at

16   388, 825 P.2d at 9 (citing Restatement § 414).  Whether a general contractor owes a duty of care

17   to the employees of a subcontractor is a question of law for the court.  Markowitz v. Ariz. Parks

18   Bd., 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985).  In Arizona, a general contractor has a duty

19   of reasonable care to provide a safe workplace for the employees of subcontractors.  Lewis, 170

20   Ariz. at 388, 825 P.2d at 9.  Therefore, as a matter of law, Paperchine owed a duty of care to

21   Enerquin and its employee Johnny Mendoza, Jr. to provide a reasonably safe place to work.

22                2.     Duty Owed by a Landowner

23         The duties of a landowner to a contractor are similar to the duties of a general contractor

24   to a subcontractor.  Silvas, 122 Ariz. at 334, 594 P.2d at 1030 (citing Fluor Corp. Ltd. v. Sykes,

25   3 Ariz. App. 559, 416 P.2d 610 (Ct. App. 1966) ("the general contractor in control of premises

26   has certain duties to the employees of a subcontractor that are usually likened to those of a

27   possessor of land to invitees"); Pruett, 27 Ariz. App. at 291, 554 P.2d at 658 (same).  Arizona

28                                            - 18 -

courts have held that landowners, as the employers of contractors, have analogous duties to general contractors with respect to Restatement § 414.  See Maders v. Estes Co., 169 Ariz. 458, 460, 820 P.2d 822, 824 (Ct. App. 1991) (applying the factors of retained control to a landowner).  Therefore, as the landowner, Abitibi had a duty of reasonable care to provide a safe workplace for the employees of Paperchine and Enerquin.

### 3.    Scope of the Duty

In Lewis, the court stated that Restatement § 414 establishes the scope of a general contractor's duty of care.  Lewis, 170 Ariz. at 388, 825 P.2d at 9.  Although an owner or general contractor have a general duty to provide a safe workplace for the employees of subcontractors, the scope of that duty extends only as far as the amount of control retained by the owner or general contractor over the work of the subcontractor.  Id.; see also Mason, 127 Ariz. at 551, 622 P.2d at 498.

Retained control of the work performed by a subcontractor can be shown through (1) contractual provisions assuming responsibility for safety at the work site, and (2) the actual exercise of control over the subcontractor's work.  Lewis, 170 Ariz. at 390, 825 P.2d at 11 (citing Jones v. Chevron, 718 P.2d 890, 896 (Wyo. 1986); Chesin Constr. Co. v. Epstein, 8 Ariz. App. 312, 315, 446 P.2d 11, 14 (1968)); see also Vega v. Griffiths Constr., 172 Ariz. 46, 47-48, 833 P.2d 717, 718-19 (Ct. App. 1992) (holding a general contractor retained control contractually and in actual exercise of control).  The issue of retained control is a question of fact that should ordinarily be left to the fact finder.  Lewis, 170 Ariz. at 389, 825 P.2d at 10.  However, a trial court is not prevented from granting summary judgment if such action is appropriate under the applicable standard.  Id.

Although the court of appeals consistently had held that "the right to exercise day-by-day control over the manner in which the details of the work are performed" was required to find an employer retained control under Restatement § 414, the court in Lewis disagreed that such extensive control was required for liability.  Id. at 390, 825 P.2d at 11 (disapproving, Reber v. Chandler High Sch. Dist. No. 202, 13 Ariz. App. 133, 135, 474 P.2d 852, 854 (Ct. App. 1970);

1  Lewis v. Riebe Enters., Inc., 170 Ariz. 207, 210, 823 P.2d 74, 77 (Ct. App. 1990); Koepke, 140

2  Ariz. at 425, 682 P.2d at 430; Sullins v. Third & Catalina Constr. P'ship, 124 Ariz. 114, 120,

3  602 P.2d 495, 501 (Ct. App. 1979); German v. Mountain States Tel. & Tel. Co., 11 Ariz. 91,

4  95, 462 P.2d 108, 112 (Ct. App. 1969)).   The Lewis court noted that the court of appeals

5  frequently misinterpreted comment (c) of Restatement § 414 to mean that an employer of a

6  contractor must be able to control the details of the work in order to be liable.  Id. (disapproving

7  Lewis, 170 Ariz. at 210, 823 P.2d at 77; Cordova v. Parrett, 146 Ariz. 79, 82, 703 P.2d 1228,

8  1231 (Ct. App. 1985); Mason, 127 Ariz. at 550, 622 P.2d at 497; German, 11 Ariz. App. at 94-

9  95, 462 P.2d at 111-12).   Comment (c) of Restatement § 414 states:

10
> In order for the rule stated in [414] to apply, the employer must have retained at
11
> least some degree of control over the manner in which the work is done.  It is not
> enough that he has merely a general right to order the work stopped or resumed,
12
> to inspect its progress or to receive reports, to make suggestions or
> recommendations which need not necessarily be followed, or to prescribe
13
> alterations and deviations.  Such a general right is usually reserved to employers,
> but it does not mean that the contractor is controlled as to his methods of work,
14
> or as to operative detail.  There must be such a retention of a right of supervision
> that the contractor is not entirely free to do the work in his own way.

15  Id. at 390-91, 825 P.2d at 11-12.  The court found that rather than requiring an employer to

16  control the day-to-day details of a subcontractor's work, this comment merely suggests that "[i]f

17  the employer reserves and exercises only the right to inspect the construction work to see that

18  the contract specifications are met while the independent contractor controls how and when the

19  work is to be done, there is probably not sufficient retained control to subject it to liability."  Id.

20  at 391, 825 P.2d at 12 (quoting Moloso v. State, 644 P.2d 205, 211 (Alaska 1982)).  However,

21  if an employer assumes affirmative duties with respect to safety, even if it is "only the power

22  to direct the order in which the work shall be done, or to forbid its being done in a manner likely

23  to be dangerous to . . . others", the employer may retain sufficient control to be liable under

24  Restatement 414 for negligently exercising its safety responsibilities.  Id. (quoting comment (a)

25  to Restatement § 414).

26  ///

27  ///

28

4.      Lewis v. N.J. Riebe Enterprises[7]

Plaintiff relies heavily on the Lewis decision for her retained control argument.  In Lewis, the court ruled that a general contractor retained sufficient control over a subcontractor's work to subject itself to possible liability under Restatement § 414.  170 Ariz. at 394, 825 P.2d at 15.  Under the facts, a general contractor, N.J. Riebe Enterprises, entered into a construction contract with a high school district to remodel and add on to Mohave High School.  Id. at 386, 825 P.2d at 7.  Riebe employed several subcontractors for the project, including Mel Garges Carpentry.  Id.  Garges, in turn, employed Lewis.  Id.  Lewis sued to recover damages for injuries he suffered during the construction project that he alleged were caused by the negligence of Riebe.  Id.  In examining the scope of the duty owed to employees of subcontractors, the court analyzed the contract between Riebe and the school district as well as Riebe's actual exercise of control over the subcontractor Garges' work.  Id. at 390-93, 825 P.2d at 11-14.

In its contract with the school district, Riebe agreed to be responsible for "initiating, maintaining and supervising all safety precautions and programs in connection with the Work," and to "take all reasonable precautions for the safety of, and [to] provide all reasonable protection to prevent damage, injury or loss to . . . all employees on the work[site]."  Id. at 391,

---

[7]Defendant Abitibi argues that Lewis does not apply because that case dealt with imposing liability on a general contractor rather than a landowner.  However, the Court finds that the Lewis analysis is on point as it relates to Abitibi.  In Lewis, the Arizona Supreme Court rejected a line of court of appeals cases that held that "liability for the negligent exercise of retained supervisory powers can attach only where there is a showing that [the general contractor reserved] 'the right to exercise day-by-day control over the manner in which the details of the work are performed.'"  Lewis, 170 Ariz. at 390, 825 P.2d at 11 (quoting Reber,13 Ariz. App. at 135, 474 P.2d at 854).  In listing the series of cases of which it disapproved, the Arizona Supreme Court included several where it was the landowner, rather than the general contractor, who was sued.  Id. (citing Reber, 13 Ariz. App. at 135, 474 P.2d at 854; Koepke, 140 Ariz. at 425, 682 P.2d at 430; Sullins,124 Ariz. at 120, 602 P.2d at 501; German, 11 Ariz. App. at 95, 462 P.2d at 112).  While the defendant in Lewis was the general contractor, the court's analysis regarding the degree of control necessary to impose liability under Restatement 414 seemingly applies to both landowners and general contractors.

825 P.2d at 12. The contract also stipulated that Riebe would appoint a safety director "whose duty shall be the prevention of accidents." Id. at 392, 825 P.2d at 13. The court found that these provisions provided Riebe with the authority to terminate any unsafe work practices, as well as imposed upon Riebe "an affirmative duty to control Garges' work methods in order to insure the safety of everyone at the work site." Id. The court held that this right to control the work, even if unexercised, was sufficient to impose liability under Restatement § 414. Id.

The court in Lewis also found evidence that Riebe actually exercised control of the worksite with respect to safety. Id. at 393, 825 P.2d at 14. Riebe as the general contractor had been involved in every stage leading to the accident. Id. Riebe had controlled the method of removing the plywood, and Riebe's employees were physically present and supervising when the injury occurred. Id. Additionally, Riebe's superintendent testified that he was responsible for overall safety on the project and that he had the power to stop the contractor's work if he believed that it was being performed in a dangerous manner. Id. The superintendent also testified that he told workers to leave the area underneath the roof when the carpenters began loosening the plywood because he believed that the method for removing the plywood was dangerous. Id. These facts were sufficient to find that Riebe exercised control of safety at the worksite.

In its analysis, the Court will examine Defendants Abitibi and Paperchine separately, and whether they retained sufficient control over the work performed by Paperchine and/or Enerquin to render Abitibi and Paperchine liable for Paperchine and/or Enerquin's negligence. Using the considerations discussed in Lewis, the Court will look at (1) contractual provisions assuming responsibility for safety at the work site, and (2) the actual exercise of control over the work on the date of the accident. Lewis, 170 Ariz. at 390, 825 P.2d at 11.

C.    Sufficiency of the Evidence as to Abitibi

1.    Contractual Responsibility

The first relevant factor for finding retained control is whether Abitibi contractually assumed the responsibility of maintaining safety at the work site where decedent Johnny

- 22 -

Mendoza, Jr. was killed. Lewis, 170 Ariz. at 390; 825 P.2d at 11. The Abitibi Purchase Order that finalized the agreement between Abitibi and Paperchine *incorporated by reference* Abitibi's General Terms and Conditions, but *not* Paperchine's form terms and conditions (Doc. 222, Ex. A, Purchase Order).[8] The Purchase Order notes the "CONDITIONS - TERMS" of the Purchase Order: "As Agreed by Contract." (Id.) The Purchase Order then expressly incorporates the Abitibi General Terms and Conditions:

> PAPERCHINE'S SCOPE OF SUPPLY FROM THEIR QUOTATION 108499-7 IS CONDISERED [sic] PART OF THIS ORDER AS IS ABITIBI CONSOLIDATED'S STANDARD TERMS AND CONDITIONS, WHICH HAVE BEEN PREVIOUSLY SUPPLIED TO PAPERCHINE.

(Id.) Although the **Abitibi** General Terms and Conditions were incorporated into the Abitibi/Paperchine agreement, **Paperchine's** one-page form General Terms and Conditions were *not* incorporated. Rather**,** only the "scope of supply" from Paperchine's Quotation was accepted by Abitibi, which did not include Paperchine's form General Terms and Conditions. Abitibi's General Terms and Conditions required Paperchine to obtain Abitibi's Contractor's Rules and assure compliance by Paperchine and its subcontractors (Doc. 136, Ex. F, Abitibi General Terms and Conditions ¶ 20.0). Additionally, Abitibi had a Health and Safety Policy in place that governed its own employees (Doc. 136, Ex. H, Abitibi Health and Safety Policy Manual).

As a result, there were several important documents that governed the relationship between mill owner Abitibi and contractor Paperchine. These documents include: (1) Abitibi's General Terms and Conditions; (2) Abitibi's Contractor's Rules; and (3) Abitibi's Health and Safety Policy Manual. The Court will briefly outline the applicable provisions of each before analyzing their legal effect.

a.    Abitibi's General Terms and Conditions

The pertinent provisions of Abitibi's General Terms and Conditions include:

---

[8]The Purchase Order between Abitibi and Paperchine was submitted by Plaintiff following oral argument (Doc. 222), and accepted by the Court (Doc. 236).

- • Abitibi required that Paperchine obtain all of Abitibi's safety regulations, policies, and requirements, and that Paperchine "ensure that its employees, subcontractors and suppliers as well as the employees of the latter two" comply with these requirements while at the Abitibi paper mill (Doc. 136, Ex. F, Abitibi General Terms and Conditions ¶ 20.0).

- • Abitibi retained the right to request that any employee of either Paperchine or one of its subcontractors be replaced for any reason (Id. at ¶ 21.0).

### b.    Abitibi Contractor's Rules

Abitibi provided its contractors and their subcontractors with a copy of Abitibi Contractor's Rules (Doc. 136, Ex. G, Contractor's Rules).  Abitibi required all outside contractors, such as Paperchine and Enerquin, to read and comply with Abitibi's Contractor's Rules (Id. at p.5).  Abitibi mandated that every employee of a contractor and/or subcontractor sign a form acknowledging that (1) they had reviewed Abitibi Contractor's Rules and would follow them; (2) they had received training in the type of work they would perform and how to perform it safely; (3) the contractor's own safety rules met or exceeded those of Abitibi; and (4) the contractor would provide and maintain all safety equipment and provide training on its usage, and that the employee had received such equipment and training (Id. at p.171).

Abitibi's Rules provided that each contractor was responsible for his employees and the employees of his subcontractors, along with the protection of fellow contractors and mill personnel (Id. at p.7).  If the contractor or subcontractor's actions, equipment, or tools posed a danger to Abitibi's personnel, other contractors, or equipment, Abitibi could ask the offending contractor or subcontractor to leave the mill (Id. at pp.7, 9, 113).

Additional provisions of the Contractor's Rules include:

- • Abitibi required all contractors to have a minimum of $1 million in general liability, automobile, and workmen's compensation insurance and to provide proof of insurance to Abitibi (Id. at p.8).

///

- 24 -

- Abitibi mandated that its contractors have their own safety rules that met or exceeded the "Abitibi Consolidated, Snowflake Mill Safety Rules," as well as all federal, state, and local agency safety standards (<u>Id.</u> at pp.9, 17, 113).  Additionally, contractors were responsible for reinforcing their own safety rules (<u>Id.</u>).

- Contractors were responsible for providing safety equipment for their employees and training them on the proper use of the equipment (<u>Id.</u> at pp.10, 11, 17).

- If a contractor or one of his employees observed any unsafe conditions, he was required to report them immediately to the Abitibi Coordinator (<u>Id.</u> at pp.14, 24).

- Abitibi required its contractors to hold both daily and weekly "tool box" safety meetings with their crews (<u>Id.</u> at p.15).

- Abitibi prohibited Paperchine from subcontracting any part of the work absent prior written approval by Abitibi (<u>Id.</u> at p.17).

### c. Health and Safety Policy Manual

Abitibi's Health and Safety Policy Manual established detailed requirements that Abitibi imposed on its <u>own</u> employees to maintain a safe workplace (Doc. 136, Ex. H, Abitibi Health and Safety Policy Manual).[9]  For example, Abitibi held department heads and supervisors responsible for a continuous effort toward the prevention of accidents (<u>Id.</u> at p.5).  Additionally, any unsafe practices or conditions observed by Abitibi employees were to be reported to an

---

[9]The Abitibi Health and Safety Policy manual includes language indicating that its provisions are directed to Abitibi employees.  For example, its "Mission Statement" provides, "Abitibi Consolidates recognizes that an integral part of our vision to be the industry's preferred place to work is the Health and Safety of our employees.  We will place a top priority in the Health and Physical well-being of our employees by providing a safe working environment and promoting the best work practices.  In meeting these objectives, the company will inform and train employees in the procedures and risks related to their duties for their protection and that of their co-workers, recognizing that employee involvement is essential in meeting these objectives. . . . We are committed to promote and preserve the Health and Safety of our employees."  (Doc. 153, Ex. 13, p.1)

immediate supervisor (Id. at p.45).  Contractors not adhering to the safety rules were not

allowed on the mill site (Id. at p.47).

### d.    Analysis of Abitibi/Paperchine Contract

In her briefing, Plaintiff contends that in its contract with Paperchine, Abitibi retained

joint responsibility for safety of all persons working at its mill.  First, in its General Terms and

Conditions, Abitibi had the right to replace any employee for non-compliance with its safety

rules and policies, including subcontractors (Doc. 136, Ex. F, Abitibi General Terms and

Conditions, § 21.0).  Second, in its Contractor's Rules, Abitibi reserved the right to ensure

compliance with its safety rules, as well as the right to order any contractor or subcontractor

who was not working safely to leave the mill (Doc. 136, Ex. G, Contractor's Rules, pp. 7, 9,

113).  Also, in the Contractor's Rules, Abitibi prohibited Paperchine from subcontracting any

part of the work without Abitibi's written approval (Id. at p.17).  According to Plaintiff, all of

these provisions demonstrate that Abitibi retained sufficient control over Paperchine and

Enerquin's work to subject Abitibi to liability under Restatement § 414.

In response, Abitibi relies upon language in its Contractor's Rules that it claims delegates

safety responsibilities to its contractors, rather than leaving that responsibility with Abitibi.  For

example, the Contractor's Rules provide that the *contractor's* supervision is responsible for

reinforcement of the safety rules (Id. at p.9).  Additionally, the *contractor* is responsible for

providing all safety equipment and training its employees on the equipment's proper use (Id.

at pp.10, 11, 17).

After examining the contractual provisions, the Court finds that the issue of whether

Abitibi retained sufficient control to impose liability under Restatement § 414 is dependent upon

a consideration of the relevant facts – thereby rendering it inappropriate to grant summary

judgment for either Plaintiff or Abitibi.  On the one hand, Abitibi had the authority to order

contractor's employees who did not adhere to safety rules off its mill property (Id. at pp. 7, 9,

113).  Abitibi also could request that any employee of either Paperchine or one of its

subcontractors be replaced for any reason (Doc. 136, Ex. F, Abitibi General Terms and

Conditions ¶ 21.0).  However, Abitibi's Contractor's Rules  gave contractors — not Abitibi — responsibility for enforcing the safety rules and providing the proper equipment and training to their employees.  See Doc. 136, Ex. G, Contractor's Rules, p. 7 ("Each contractor is responsible for his personnel and the personnel of his subcontractors, as well as the protection of fellow contractors and mill personnel at the mill site."); Id. ("All of the Contractor's Rules apply equally to contractors and subcontractors and it is mandatory that the contractor, exact the same requirements from each of his subcontractors, if any."); Id. at p.9 ("Each Contractor must have his/her own safety rules. . . . The contractor's supervision is responsible for reinforcement of their safety rules."); Id. at p.10 ("The contractor is to provide safety equipment supplies for his employees . . . . Contractor's employees must be trained on the use of safety equipment."); Id. at p.11 ("The contractor will provide and maintain safe tools and equipment for the work."); Id. at p.17 ("The contractor will provide all tools, equipment, expendables, labor, supervision, and materials . . . testing . . . for proper completion of all work  performed at the mill site."). Abitibi's General Terms and Conditions also held contractors like Paperchine responsible for obtaining Abitibi's safety policies and ensuring that its own employees, as well as subcontractors, complied with them (Doc. 136, Ex. F, Abitibi General Terms and Conditions ¶ 20.0).  These contractual provisions present a question of fact for a jury as to the degree of control contractually assumed by Abitibi over safety.

> 2. Actual Exercise

Abitibi's actual exercise of control over Paperchine's work also is relevant in determining whether Abitibi retained sufficient control for liability under Restatement § 414. Abitibi required workers at the job site to check in with Abitibi security prior to accessing the work site (Doc. 136, Ex. D, Voss Dep., 65:22-66:7; Doc. 202, Ex. F, Lovaas Dep., 90:14-91:4). Before the work at the mill began, Paperchine did a walk-thru with Abitibi to identify potential safety hazards to Paperchine employees, such as the need for fall protection equipment (Doc. 202, Ex. F, Lovaas Dep., 25:25-30:15).  During the paper mill #3 project, Abitibi had supervisors walking around the paper mill making safety inspections several times a day (Doc.

1  136, Ex. C, Tierney Dep., 103:11-21, 143:23-144:7, 144:17-22; Ex. D, Voss Dep.,171:5-11,

2  177:23-178:8; Doc. 233; Doc. 202, Ex. F, Lovaas Dep., 39:3-40:15, 46:13-23).   Abitibi's

3  supervisors had responsibility for making sure that all the work was done safely (Doc. 170, Ex.

4  B, Comer Dep., 26:1-27:6, 27:11-28:4, 150:18-151:3).  If the supervisor observed any unsafe

5  work practices, whether by an Abitibi employee or a contractor, Abitibi's supervisor had an

6  obligation to correct the unsafe practice (Id.; Doc. 233, Ex. A, McKee Dep., 26:17-28:8, 58:24-

7  60:1, 64:23-65:3, 71:20-72:16, 73:17-74:1). Abitibi also required that Paperchine report any

8  unsafe practices to Abitibi (Doc. 233, Ex. A, McKee Dep., 52:5-11, 52:25-54:5).   Abitibi

9  personnel met with Paperchine and subcontractor Enerquin twice daily to keep informed

10  regarding the project status (Doc. 136, Ex. D, Voss Dep., 64:2-11).

11      Abitibi retained the power to demand that Paperchine replace any employee or

12  subcontractor's employee that Abitibi believed was not working safely, and could have stopped

13  the project at any time for safety rule violations (Doc. 233, Ex. A, McKee Dep., 36:6-37:18,

14  38:15-39:17, 49:11-50:22, 73:5-16).  Indeed, Abitibi shut down the entire mill when the subject

15  accident occurred (Doc. 136, Ex. D, Voss Dep., 265:14-266:2).

16      However, Abitibi did not supervise Paperchine or Enerquin employees on a day-to-day

17  basis or control the work that they did on the project (Doc. 151, Ex. 2, Voss Dep., 286:22-287:6,

18  Doc. 231, Ex. 1, Mendoza, Sr. Dep., 93:23-94:1).  Abitibi never gave specific directives to

19  Paperchine or Enerquin regarding their job duties (Doc. 136, Ex. C, Tierney Dep., 144:12-16).

20  Furthermore, Abitibi never advised Paperchine or Enerquin as to which employees should

21  perform certain construction tasks (Doc. 151, Ex. 1, Kreizenbeck Aff. ¶ 4).   Rather, Abitibi

22  allowed Paperchine and its subcontractors such as Enerquin to complete the work in the manner

23  that they believed would accomplish the project vision, provided that the mill's safety standards

24  were followed (Id. at ¶ 5).  Any questions regarding how to perform the work were not directed

25  to Abitibi; instead Abitibi merely ensured that the project remained on schedule (Id. at ¶¶ 6-7).

26  Abitibi did not request Enerquin to remove the false ceiling panels, or ask for any specific work

27  to be done (Doc. 231, Ex. 1, Mendoza, Sr. Dep., 93:12-22).

28

Based upon the evidence presented, the Court finds that a question of fact exists whether Abitibi exercised actual control over Paperchine's work to impose liability under Restatement § 414. There was evidence that Abitibi had supervisors walking around the mill engaged in safety inspections (Doc. 136, Ex. C, Tierney Dep., 103:11-21, 143:23-144:7, 144:17-22; Ex. D, Voss Dep.,171:5-11, 177:23-178:8; Doc. 202, Ex. F, Lovaas Dep., 39:3-40:15, 46:13-23), and that Abitibi supervisors had an obligation to correct any unsafe practices they observed (Doc. 233, Ex. A, McKee Dep., 26:17-28:8, 58:24-60:1, 64:23-65:3, 71:20-72:16, 73:17-74:1). Furthermore, Abitibi had the power to stop the project for safety violations (Id. at 36:6-37:18, 38:15-39:17, 49:11-50:22, 73:5-16). Despite this evidence, there also was other evidence that Abitibi did not make decisions regarding who should do the work, how it should be done, or when it should be done (Doc. 151, Ex. 2, Voss Dep., 286:22-287:6, Doc. 231, Ex. 1, Mendoza, Sr. Dep., 93:23-94:1). Abitibi only ensured that the project stayed on schedule and kept track of its progress (Doc. 151, Ex. 1, Kreizenbeck Aff). Thus, summary judgment will be denied to both parties.

D.   Sufficiency of the Evidence as to Paperchine

1.   Contractual Responsibility

The first relevant factor for finding retained control is whether Paperchine contractually assumed affirmative duties with respect to safety at the job site where decedent Johnny Mendoza, Jr. was killed. To demonstrate retained control, Plaintiff points to Abitibi's General Terms and Conditions which state that a contractor is "responsible for obtaining the regulations, policies and requirements of [Abitibi] in matters of . . . safety" and must ensure that its employees and the employees of its subcontractors comply with these regulations (Doc. 153, Ex. 14, Abitibi General Terms and Conditions ¶ 20.0). Furthermore, in Abitibi's Contractor's Rules, the contractor is responsible for ensuring that its own employees, as well as those of any subcontractors, comply with all safety rules (Doc. 136, Ex. G, Contractor's Rules, pp. 7, 9). The Contractor's Rules also require Paperchine to supply safety equipment and training to its own employees and to ensure that its subcontractors did the same (Id. at pp. 10, 11, 17). In

- 29 -

1    response, Paperchine argues that Abitibi's provisions require any contractor operating on the
2    premises, whether Paperchine or Enerquin, to do the following: (1) comply with Abitibi's rules;
3    (2) exercise responsibility for its own personnel; (3) have safety rules that meet or exceed
4    Abitibi's; (4) reinforce the contractor/subcontractor's own safety rules; and (5) provide safety
5    equipment and training to its own employees (DPSSOF ¶¶ C-F).

6        The Court finds that a question of fact exists as to whether Paperchine contractually
7    assumed responsibility for Enerquin and Johnny Mendoza, Sr.'s safety.  In Abitibi's General
8    Terms and Conditions, a contractor is given responsibility for ensuring that the contractor's
9    employees and subcontractor's employees comply with Abitibi's safety rules.  However, in
10   Abitibi's Contractor's Rules, it states that "the contractor's supervision is responsible for
11   reinforcement of their safety rules."  (Doc. 136, Ex. G, Contractor's Rules, p.9)  The language
12   refers only to "the contractor" and does not specify whether the "contractor" is Paperchine, or
13   all contractors, including subcontractors.  Thus, it is unclear whether Paperchine assumed an
14   affirmative duty as to subcontractor's employees, or whether Enerquin has responsibility for its
15   own employees.

16                    2.    Actual Exercise

17       In addition to contractual responsibilities, a general contractor's actual exercise of control
18   over a subcontractor's work is a relevant consideration in deciding whether Paperchine retained
19   sufficient control over Enerquin, and thus, Johnny Mendoza, Jr.'s work.  Lewis, 170 Ariz. at
20   390, 825 P.2d at 11.

21       Plaintiff points to deposition testimony by Paperchine's project manager, Micky Tierney,
22   and its safety representative, Gail Voss, where both admit that Paperchine was responsible for
23   assuring a safe work place, and enforcing safety rules and regulations for its own employees and
24   its subcontractor (Doc. 136, Ex. C, Tierney Dep., 51:9-53:7, 54:18-55:7,76:15-77:8, 101:24-
25   102:23; Ex. D, Voss Dep.,22:22-23:9, 75:4-9, 117:8-18).  This responsibility included ensuring
26   that its subcontractors, including Enerquin, had appropriate safety policies and training (Doc.
27   136, Ex. D, Voss Dep.,38:13-39:5).  Additionally, Paperchine had the ability to stop any

28                                    - 30 -

1    Enerquin employee and demand compliance with safety rules at any point (Doc. 136, Ex. C,

2    Tierney Dep.,50:13-51:8,54:18-55:7,101:24-102:23,139:1-22; Ex. D, Voss Dep.,74:1-75:3,

3    83:1-84:4, 103:20-104:5). Moreover, Paperchine had safety inspectors at the job site observing

4    the work done at the mill and making sure that safe practices were followed by Paperchine

5    employees and subcontractors (Doc. 153, Ex. 1, Voss Dep., 177:16-178:8; Doc. 202, Ex. E,

6    Morris Dep., 29:10-16).

7         On the other hand, Paperchine relies upon controverting facts that Paperchine did not

8    exercise actual control over Enerquin's (and Johnny Mendoza, Jr.'s) work in removing the false

9    ceiling panels. First, Enerquin contracted to have its own supervisors monitor the work and

10   safety of Enerquin's employees (Doc. 136, Ex. D, Voss Dep., 72:12-73:4, 73:24-25, 112:2-5,

11   115:7-12). Indeed, Paperchine paid Enerquin to have a supervisor present to conduct

12   supervisory activities with Enerquin's employees (Id. at 112:2-5). While Paperchine had an

13   obligation to ensure that the work was performed safely, the decision of how to perform the

14   work was left to Enerquin (Id. at 91:10-19). Paperchine had no discussions with Enerquin about

15   how Enerquin would remove the false ceiling panels or install the dryer hood, but entrusted

16   those decisions to Enerquin (Doc. 153, Ex. 6, Tierney Dep., 55:25-56:7).

17         Additionally, Paperchine relied on Enerquin to ensure that Enerquin's employees

18   completed the work safely (Doc. 136, Ex. D, Voss Dep., 91:10-19). Enerquin provided safety

19   equipment to its employees, and trained its employees how to use the equipment safely (Doc.

20   200, Ex. 1, Young Dep., 54:23-55:11). Enerquin held its own safety meetings (Doc. 153,

21   Exhibit 1, Voss Dep., 108:2).

22         While Paperchine did request that Enerquin remove two (2) additional false ceiling

23   panels, it left the timing, method, and manner of removal up to Enerquin (Doc. 153, Ex. 6,

24   Tierney Dep., 93-96). Paperchine did not direct Enerquin employees how to remove or handle

25   the additional false ceiling panels, and was not involved in deciding which employees would

26   move the panels (Doc. 200, Ex. 1, Young Dep., 49:2-12; Ex. 3, Scullion Dep., 29:19-30:1).

27

28                                        - 31 -

Enerquin's on-site supervisor, Johnny Mendoza, Sr., was responsible for selecting Enerquin employees with sufficient knowledge and experience to complete the work safely (Doc. 200, Ex. 1, Young Dep., 36:1-9). He also was responsible for explaining to the Enerquin employees he selected how to perform a particular task and confirming the safest way to perform the work (Id. at 35:14-25, 36:6-9). Paperchine did not tell Johnny Mendoza, Sr. who they wanted to perform the work, how many people to assign to the work, or how the work was to be completed (Doc. 232, Ex. 1, Mendoza, Sr. Dep., 21:21-22:9).

After examining the evidence presented by Plaintiff and Paperchine, the issue of whether Paperchine exercised actual control over Enerquin's work to impose liability under Restatement § 414 is dependent upon a consideration of the relevant facts – thereby rendering it inappropriate to grant summary judgment for either party. See Lewis, 170 Ariz. at 389, 825 P.2d at 10 (holding that the question of whether the general contractor retained sufficient control over the independent contractor's work as to be liable under § 414 was a factual question for the jury, noting " . . . [w]e believe that the issue of retained control is also a *question of fact* which ordinarily should be left to the fact finder."). Plaintiff draws upon statements made by Gail Voss and Micky Tierney where they admit that Paperchine supervised Enerquin's work with respect to safety (Doc. 136, Ex. C, Tierney Dep., 51:9-53:7, 54:18-55:7,76:15-77:8, 101:24-102:23; Ex. D, Voss Dep.,22:22-23:9, 75:4-9, 117:8-18). However, in other places the supervisors state that Enerquin exercised safety responsibility for its own employees (Doc. 136, Ex. D, Voss Dep., 72:12-73:4, 73:24-25, 112:2-5, 115:7-12). Accordingly, it appears that there is a material issue of fact in making this determination. Furthermore, while Paperchine asked Enerquin to remove the two additional false ceiling panels to accommodate the crane, it did not control the timing or method of removal (Doc. 153, Ex. 6, Tierney Dep., 93-96).

**IV.     Contractual & Statutory Responsibility**

Plaintiff argues that non-delegable duties may be imposed by statute, common law, or contract. A non-delegable duty to assure safety at the worksite is often imposed based upon the contractual assumption of responsibility for safety by a general contractor. Plaintiff contends

1   that Paperchine assumed contractual obligations for worker safety, including providing fall

2   protection training, equipment, and supervision, and enforcing compliance with OSHA and

3   ADOSH regulations.  These duties were non-delegable.  Additionally, Plaintiff contends that

4   Paperchine had non-delegable regulatory duties under OSHA and ADOSH.  Plaintiff relies upon

5   Restatement § 424 in claiming that Paperchine was required by federal and state regulation to

6   provide a safe workplace, including fall protection, for all employees, including Johnny

7   Mendoza, Jr.  According to Plaintiff, OSHA part 1926.16(a) provides that the duty of a general

8   contractor to comply with OSHA and ensure safety at the worksite is non-delegable.  Thus,

9   Paperchine is vicariously liable for Enerquin's failure to comply with these duties.

10          In response, Paperchine asserts that Arizona courts have found Restatement § 424

11   inapplicable in Arizona, relying on Cordova, 146 Ariz. at 81, 703 P.2d at 1230 and Sullins, 124

12   Ariz. at 117, 602 P.2d at 498.  Plaintiff, however, points out that Cordova, merely cites to

13   Sullins, which in turn cites to Welker for the statement that "The Arizona courts have expressly

14   rejected the principle of non-delegable duties of contractors . . . ." Sullins, 124 Ariz. at 117, 602

15   P.2d at 498.  Since Plaintiff believes that Welker is no longer good law, as previously explained,

16   Plaintiff argues that Welker cannot provide support for refusing to apply Restatement § 424.

17          Restatement § 424 provides:

18          One who by statute or by administrative regulation is under a duty to provide
            specified safeguards or precautions for the safety of others is subject to liability
19          to the others for whose protection the duty is imposed for harm caused by the
            failure of a contractor employed by him to provide such safeguards or
20          precautions.

21   In Arizona, courts have held that Restatement § 424 does not impose a non-delegable duty upon

22   a property owner who has contracted with independent contractor.  See Cordova, 146 Ariz. at

23   81, 703 P.2d at 1230 ("§ 424 of the Restatement has been held to be inapplicable in Arizona.

24   . . . Division One of this court stated in Sullins that § 424 does not apply in the area of tort law

25   governing the relationship of the employer of an independent contractor to an employee of that

26   contractor."); Sullins, 124 Ariz. at 117, 602 P.2d at 498, ("While it is axiomatic that the courts

27   of Arizona will follow the application of the Restatement (Second) of Torts in the absence of

28                                              - 33 -

1   authority to the contrary, it is clear that the Restatement (Second) of Torts s 424 does not apply

2   in the area of the law governing the relationship of an owner of property to an employee of an

3   independent contractor. ").  While the analysis in Cordova and Sullins traces back to Welker

4   and its rejection of non-delegable duties of contractors, the Court has found Welker still is a

5   valid precedent, as discussed above.  Thus, under the holdings of these cases, Restatement § 424

6   is not applicable in Arizona when dealing with the relationship between an employer of an

7   independent contractor and the contractor's employee.  To the extent that Plaintiff is seeking

8   to impose vicarious liability through Restatement § 424, the Court finds in favor of Paperchine

9   on this issue as a matter of law.

10  **V.      Workers Compensation**

11          Since Plaintiff seeks to impose vicarious liability on Paperchine through the negligence

12  of Enerquin, Paperchine argues that it is entitled to those defenses available to Enerquin.  As

13  the Court does not find that Paperchine is vicariously liable for Enerquin's negligence, as

14  discussed above, the Court will not address this argument.

15                                      **CONCLUSION**

16          Summary judgment in Defendants Abitibi and Paperchine's favor is proper as to

17  Plaintiff's premises liability theory because Restatement § 422 does not apply to suits by

18  employees of independent contractors.  With regards to Plaintiff's theory of retained control

19  pursuant to Restatement § 414, summary judgment is not proper as to any party because genuine

20  issues of material fact exist.  Finally, the Court grants summary judgment to Paperchine on

21  Plaintiff's vicarious liability claim under Restatement § 424.

22          **IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment is

23  **denied** (Doc. 135).

24          **IT IS FURTHER ORDERED** that Defendant Abitibi's Cross-Motion for Partial

25  Summary Judgment is **granted** as to premises liability under Restatement § 422 and **denied** as

26  to retained control under Restatement § 414 (Doc. 148).

27

28                                          - 34 -

1      **IT IS FURTHER ORDERED** that Defendant Paperchine's Cross-Motion for Summary

2   Judgment (Doc. 157) is **granted** as to premises liability under Restatement § 422, and vicarious

3   liability pursuant to Restatement § 424.  The motion is **denied** as to retained control under

4   Restatement § 414.

5      **IT IS FURTHER ORDERED** setting a status conference in this case for October 12,

6   2010, at 11:30am.

7      DATED this 30th day of September, 2010.

8

9      _____

10                 Stephen M. McNamee
                   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              - 35 -